IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

**APRIL AGATUCCI**,

        Plaintiff,

    v.

**CAROLYN W. COLVIN**,
Acting Commissioner of the Social Security
Administration,

        Defendant.

_____

**Civ. No. 6:13-cv-01626-MC**

**OPINION AND ORDER**

**MCSHANE, Judge**:

    Plaintiff April Agatucci brings this action for judicial review of a final decision of the Commissioner of Social Security denying her application for disability insurance benefits (DIB) under Title II of the Social Security Act. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3).

    The issues before this Court are: (1) whether the Administrative Law Judge (ALJ) erred in evaluating a medical source statement submitted by plaintiff's treating physician, Dr. Nelson; (2) whether the ALJ erred in evaluating plaintiff's testimony; and (3) whether the ALJ erred in evaluating a function report submitted by a lay witness. Because the ALJ articulated sufficient reasons supported by substantial evidence in the record for his evaluation of the respective evidence, the Commissioner's decision is AFFIRMED.

### PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff applied for DIB on November 19, 2009, alleging disability since February 1, 2008. Tr. 11, 160–63. This claim was denied initially and upon reconsideration. Tr. 11, 83–86, 88–90. Plaintiff timely requested a hearing before an Administrative Law Judge (ALJ), and appeared via videoconference before the Honorable John Moreen on January 13, 2012, tr. 11, 56–80, and on April 6, 2012, tr. 11, 33–55. ALJ Moreen denied plaintiff's claim by a written decision dated April 27, 2012. Tr. 11–26. Plaintiff sought review from the Appeals Council, which was subsequently denied, thus rendering the ALJ's decision final. Tr. 1–3. Plaintiff now seeks judicial review.

Plaintiff, born on January 24, 1974, tr. 24, 59, 160, graduated from high school, attended two years of college, tr. 60, 215, and worked most recently as a special education assistant (2007–2008), tr. 61, 215, and loan closer (2005–2006), tr. 63, 215. Plaintiff was thirty-four at the time of alleged disability onset, and thirty-eight at the time of her second hearing. *See* tr. 24, 59, 160. Plaintiff alleges disability due to: degenerative disk disease of the lumbar spine; obesity; left hip osteoarthritis; post-traumatic stress disorder; pain disorder; major depression; generalized anxiety disorder; cognitive disorder; insomnia, and reduced cortisol production. *See* tr. 14, 189; Pl.'s Br. 2, ECF No. 15.

## STANDARD OF REVIEW

The reviewing court shall affirm the Commissioner's decision if the decision is based on proper legal standards and the legal findings are supported by substantial evidence on the record. *See* 42 U.S.C. § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). To determine whether substantial evidence exists, this Court reviews the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion. *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986).

2 – OPINION AND ORDER

**DISCUSSION**

The Social Security Administration utilizes a five step sequential evaluation to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920. The initial burden of proof rests upon the claimant to meet the first four steps. If a claimant satisfies his or her burden with respect to the first four steps, the burden shifts to the Commissioner for step five. 20 C.F.R. § 404.1520. At step five, the Commissioner's burden is to demonstrate that the claimant is capable of making an adjustment to other work after considering the claimant's residual functional capacity (RFC), age, education, and work experience. *Id.*

Plaintiff contends that the ALJ's disability decision is not supported by substantial evidence and is based on an application of incorrect legal standards. In particular, plaintiff argues that: (1) the ALJ erred in evaluating a medical source statement submitted by Dr. Nelson; (2) the ALJ erred in evaluating plaintiff's testimony; and (3) the ALJ erred in evaluating a function report submitted by a lay witness.

**I. Dr. Nelson's Medical Source Statement**

Plaintiff contends that the ALJ erred in evaluating a medical source statement submitted by Dr. Nelson. *See* Pl.'s Br. 13–16, ECF No. 15. In response, defendant argues that the ALJ provided sufficient reasons for partially rejecting the medical source statement. *See* Def.'s Br. 10–14, ECF No. 17.

"To reject an uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (citing *Lester v. Chater*, 81 F.3d 821, 830–31 (9th Cir. 1995)). "If a treating or examining doctor's opinion is contracted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by

3 – OPINION AND ORDER

substantial evidence." *Id.* (citation omitted). When evaluating conflicting medical opinions, an ALJ need not accept a brief, conclusory, or inadequately supported opinion. *Id.* (citing *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001)). Because Dr. Nelson's medical source statement is contradicted in the record,[1] it can only be rejected by providing specific and legitimate reasons that are supported by substantial evidence.

Plaintiff met with James Nelson, M.D. more than thirty times between February 2007 and January 2012. *See* tr. 317–69, 387, 422–31, 461–85, 495–99, 502–14, 520–22, 524–29, 551–56. On or about January 11, 2012, Dr. Nelson submitted a check-the-box medical source statement form on plaintiff's behalf. *See* tr. 531–34. In that form, Dr. Nelson opined that plaintiff's limitations included: an inability to perform either sustained sedentary or light work on a regular and continuing basis; moderately severe limitations in her ability to maintain attention and concentration for extended periods; moderately severe limitations in her ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; and severe limitations in her ability to complete a normal workday and workweek without interruptions from medically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 531–33. Dr. Nelson indicated that

---

[1] *See* tr. 392–99 (On February 16, 2010, Sharon B. Eder, M.D. opined that plaintiff's exertional limitations restricted her to: occasionally lifting and/or carrying up to fifty pounds; frequently lifting and/or carrying up to twenty-five pounds; standing and/or walking about six hours in an eight-hour day; and sitting about six hours in an eight-hour day.); tr. 400–04 (On April 4, 2010, Michelle Whitehead, M.H.N.P., Ph.D. conducted a consultative mental status evaluation. Following this evaluation, Dr. Whitehead opined that plaintiff should be able to work a modified schedule *at least* on a part time basis.); tr. 404–17 (On April 7, 2010, Joshua J. Boyd, Psy.D. opined that plaintiff did not have any functional limitations.); tr. 436 (On July 12, 2010, Neal E. Berner, M.D. affirmed Dr. Eder's physical RFC findings.); tr. 437 (On July 13, 2010, Paul Rethinger, Ph.D. affirmed Dr. Boyd's mental RFC findings.); tr. 547–49 (On March 14, 2012, William Trueblood, PC, Ph.D., ABN opined that plaintiff had moderate limitations in her ability to: understand and remember complex instructions; carry out complex instructions; make judgments on complex work related-related decisions; interact appropriately with supervisors and co-workers; and respond appropriately to usual work situations and changes in routine work settings. Dr. Trueblood also opined that plaintiff had marked limitations in her ability to interact appropriately with the public.).

the onset date for plaintiff's non-exertional limitations was October 2010; approximately *thirty-two months after* plaintiff's alleged onset date. *See* tr. 534.

The ALJ, having reviewed Dr. Nelson's medical source statement, rejected this statement because it was inconsistent with the medical record and lacked sufficient explanation. *See* tr. 19–21.

As to inconsistency with the medical record, plaintiff broadly asserts that select abnormal examination findings support Dr. Nelson's medical source statement. *See* Pl.'s Br. 14, ECF No. 15. This Court, having reviewed the record, is not persuaded.

First, the ALJ assigned "great weight" to the opinion of consultative examiner William Trueblood, Ph.D. *See* tr. 20. Plaintiff met with Dr. Trueblood on March 6, 2012 for a neuropsychological screening examination.[2] Based upon the results of this examination, Dr. Trueblood opined that plaintiff had *moderate* limitations in her ability to: understand and remember complex instructions; carry out complex instructions; make judgments on complex work-related decisions; interact appropriately with supervisors and coworkers; and respond appropriately to usual work situations and to changes in a routine work setting. Tr. 547–48. Dr. Trueblood also opined that plaintiff had marked limitations in her ability to interact appropriately with the public. Tr. 548. The ALJ gave greater weight to this opinion than to Dr. Nelson's medical source statement because "[Dr. Nelson] is not a specialist in mental health, and the findings of the consultative examiners and the record as a whole support the [RFC]." Tr. 21. To the extent that the ALJ considered Dr. Trueblood's specialization, such consideration was

---

[2] Pursuant to this evaluation, Dr. Trueblood administered multiple psychological tests, including: Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV); Wechsler Memory Scale-Fourth Edition (WMS-IV); Trail Making Test; Aphasia Screening Test; and Vineland Adaptive Behavior Scales, Second Edition-Survey Interview Format (Vineland-II). Tr. 535.

authorized under the Social Security Act. *See* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."); *see also* tr. 428 (On April 20, 2010, Dr. Nelson indicated that he was "at a loss [to] see how to manage her current situation. It seems apparent that there is a significant psychotic factor[] playing into her current physical issues . . . .").

Second, the ALJ assigned some weight to the opinion of consultative examiner, Michelle Whitehead, MHNP, Ph.D. *See* tr. 21. Plaintiff met with Dr. Whitehead on April 4, 2010 for a clinical interview and mental status examination. *See* tr. 400–03. Based upon the results of this examination, Dr. Whitehead opined that plaintiff had "employable skills and should be able to work a modified schedule at least [on a] part time basis." Tr. 403. The ALJ considered Dr. Whitehead's examination findings, e.g., "adequate concentration, persistence and pace during the interview," tr. 402, and concluded that these findings supported the RFC, tr. 21. This finding, which is not disputed by plaintiff, is reasonable.

Third, the ALJ assigned "substantial weight" to the opinions of consultant Drs. Eder and Boyd. *See* tr. 18. On February 16, 2010, Dr. Eder opined that plaintiff's exertional limitations restricted her to: occasionally lifting and/or carrying up to fifty pounds; frequently lifting and/or carrying up to twenty-five pounds; standing and/or walking about six hours in an eight-hour day; and sitting about six hours in an eight-hour day. *See* tr. 393. Dr. Eder further specified that "[i]t appears based on objective findings alone [claimant] would be capable of sustaining medium level work duties." *Id*. On July 12, 2010, Dr. Berner affirmed Dr. Eder's physical RFC findings. Tr. 436. The ALJ reasonably concluded that these opined functional limitations, which conflict

with Dr. Nelson's check-the-box general assertions that plaintiff is unable to perform sedentary or light work, *see* tr. 531–32, were consistent with the record as a whole, *see infra* § I.

Fourth, the ALJ found that the treatment notes of Drs. Nelson, Monchamp, Whitehead, Meador, and Nebolon supported the RFC. *See* tr. 18–20. Plaintiff contests this finding as it relates to plaintiff's *physical* limitations by directing this Court's attention to abnormal examination findings in the record. Pl.'s Br. 14, ECF No. 15 (citing tr. 317–19, 422–31, 461–90, 494–529, 550–56). This Court, having reviewed the record, finds that these treatment notes, when considered in light of plaintiff's generally normal examination and testing findings, *see, e.g.*, tr. 345, 432, 453–54, 498, 505, 510, 516, can reasonably be interpreted as supportive of the RFC.

Fifth, the ALJ concluded that the objective medical evidence "lends additional support to the [RFC]." Tr. 19. The ALJ explained:

> A December 2007 MRI of the claimant's lumbar spine showed a small right paracentral disc protrusion at L5-S1, with no evidence of impingement at the right S1 nerve root. In March 2008, the claimant had no acute fractures and no significant narrowing of the hip joint on a left hip x-ray. An October 2008 lumbar SPECT bone scan was negative. More recently, an April 2011 MRI of the claimant's left hip revealed no cause for the claimant's left hip pain and no labral tear. A July 2011 MRI of the claimant's lumbar spine also showed a minimal right paracentral disc protrusion, with an annular fissure, at L5-S1. The record contains no evidence of radiculopathy, stenosis, or nerve root impingement in the claimant's lumbar spine.

Tr. 19 (citations omitted). This finding is reasonable and consistent with the treatment notes. *See* tr. 341 (Following the October 2008 lumbar bone scan, Dr. Nelson noted that plaintiff's "[p]rior workup ha[d] largely been negative for any overt nerve compression and/or focal abnormalities . . . . We repeated the scan . . . and this is essentially negative."); tr. 428 (On April 20, 2010, Dr. Nelson reassured plaintiff "regarding her neurologic status[,] her normal examination overall[,]

7 – OPINION AND ORDER

and the normal findings on her imaging."); tr. 510 (Following the April 2011 MRI, Dr. Nelson

"explained to the patient that most of the imaging we've down has not shown a marked

pathology and there is a reasonable chance that most of this remains psychologic in origin."); tr.

498 (Following the July 2011 MRI, Dr. Nelson "indicated to [plaintiff] that from both the

physical examination and imaging workup she does not have marked abnormalities to be

concerned about . . . . We have not found marked organic pathology in any of her situations

where her pain has markedly increased.").

      As to Dr. Nelson's insufficient explanation, plaintiff argues that Dr. Nelson had

"abundant objective evidence to support his conclusions." Pl.'s Br. 14, ECF No. 15. This Court,

cognizant of plaintiff's extensive treatment with Dr. Nelson, is not persuaded that the existence

of this treatment relationship *alone* is enough to substantiate an otherwise unexplained opinion.

As the ALJ explained: "Dr. Nelson did not cite specific diagnostic evidence in support [of] his

restrictive opinion. Dr. Nelson simply completed a form with check boxes in providing his

opinion and failed to explain his reasoning for restricting [] the claimant to less than sedentary

work." Tr. 19–20. In fact, Dr. Nelson *declined* to explain his basis for opinion despite an explicit

request by plaintiff. Tr. 534.[3] Absent *any* narrative explanation, it was entirely reasonable for the

ALJ to consider Dr. Nelson's insufficient explanation as a specific and legitimate reason. *See*

---

[3] The medical source statement submitted by Dr. Nelson provides in relevant part:

**COMMENTS**

    In the space below, or if you prefer, in a separate letter, please **describe** the aspects of the
(1) medical history; (2) clinical findings; (3) laboratory findings; (4) diagnoses (statement
of disease or injury based on its signs and symptoms); and (5) treatment prescribed with
response, and prognosis upon which you based your opinion of the referenced
individual's functional limitations during the above-stated period of time.

Tr. 534.

8 – OPINION AND ORDER

*Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996) ("The ALJ . . . permissibly rejected . . . check-off reports that did not contain any explanation of the bases of their conclusions." (citation omitted)); *see also* 20 C.F.R. § 404.1527(c)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion.").

The ALJ, having considered these reasons, properly rejected Dr. Nelson's opinion to the extent that it was inconsistent with the RFC.[4]

## II. Plaintiff's Testimony

Plaintiff contends that the ALJ improperly rejected her testimony. Pl.'s Br. 13–16, ECF No. 15. In response, defendant argues that the ALJ's findings are supported by substantial evidence. Def.'s Br. 5–10, ECF No. 17.

An ALJ must consider a claimant's symptom testimony, including statements regarding pain and workplace limitations. *See* 20 CFR §§ 404.1529, 416.929. "In deciding whether to accept [this testimony], an ALJ must perform two stages of analysis: the *Cotton* analysis and an analysis of the credibility of the claimant's testimony regarding the severity of her symptoms." *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). If a claimant meets the *Cotton* analysis[5] and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Id.* (citing *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993)). This Court "may not engage in second-guessing," *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (citations omitted),

---

[4] The ALJ determined that plaintiff had the RFC "to perform medium work . . . except: the claimant would be limited to performing simple, routine, repetitive tasks and occasional contact with the public." Tr. 17.

[5] "The *Cotton* test imposes only two requirements on the claimant: (1) she must produce objective medical evidence of an impairment or impairments; and (2) she must show that the impairment or combination of impairments *could reasonably be expected to* (not that it did in fact) produce some degree of symptom." *Smolen*, 80 F.3d at 1282 (citing *Cotton v. Bowen*, 799 F.2d 1403, 1407–08 (9th Cir. 1986)).

and "must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation," *Andrews v. Shalala*, 53 F.3d 1035, 1039–40 (9th Cir. 1995) (citations omitted).

The ALJ found that plaintiff's statements concerning the intensity, persistence and limited effects of her symptoms were not credible to the extent that they were inconsistent with the RFC. Tr. 22. In making this determination, the ALJ relied on four bases, including: (1) inconsistency with the medical evidence; (2) plaintiff's course of treatment; (3) plaintiff's exaggerated pain behavior; and (4) plaintiff's activities of daily living.

First, the ALJ found that the "objective evidence does not support the claimant's allegations." Tr. 22. The ALJ explained:

> As discussed above, there is simply not enough evidence of debilitating impairments to make the allegations readily believable. Indeed, the findings of the MRI and x-ray results in the record, and the findings of Dr. Trueblood and Dr. Whitehead are all consistent with the [RFC].

*Id*. An ALJ may properly consider medical signs, laboratory findings, and medical opinions provided by examining physicians to assess a claimant's credibility. *See* SSR 96-7P, 1996 WL 374186, at *5 (July 2, 1996); *see also* 20 C.F.R. § 404.1529(c)(2) ("Objective medical evidence . . . is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms."). As discussed *supra* § I, the ALJ's interpretation of the medical record, which included the objective medical evidence, e.g., MRI and x-ray results, was reasonable and consistent with the treatment notes. The ALJ's reliance on this evidence, particularly plaintiff's physical examination findings, *see, e.g.*, tr. 423, 427, 430, 554, constitutes a sufficiently specific reason to reject plaintiff's alleged physical limitations, e.g., difficulty standing, sitting, and walking, *see, e.g.*, tr. 212, 223, 229. Likewise, the ALJ's reliance on the

opinions of Drs. Trueblood and Whitehead constitutes a sufficiently specific reason to partially reject plaintiff's alleged concentration, anxiety, and memory deficits. *See* tr. 72, 229, 537.

Second, the ALJ emphasized that plaintiff's course of treatment was "largely routine" and that she repeatedly failed to follow treatment recommendations. *See* tr. 22–23. Both reasons, if supported in the record, can support an adverse credibility finding. *See Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) ("[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment."); *Smolen*, 80 F.3d at 1284 ("The ALJ may consider . . . unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment . . . .").

Plaintiff argues that scheduling conflicts and symptoms, *see* tr. 491–92, and her limited financial resources, *see* tr. 75, 78, 555, adequately explain her course of treatment, Pl.'s Reply Br. 3, ECF No. 18. This Court looks to the record.

As to scheduling conflicts and symptoms, between February 16, 2011 and May 11, 2011, plaintiff cancelled five out of twelve counseling appointments. *See* tr. 491. Plaintiff's treating counselor, Susan Middleton, LCSW, reported that three of these cancellations were caused by symptoms, including headaches, migraines, and leg numbness. *See* tr. 491–92. Two cancellations, April 27 and May 4, 2011, remain unexplained. *See* tr. 492.[6] As a result, the ALJ properly considered these two absences.

As to limited financial resources, plaintiff testified that she did not have the money to pay for continued counseling, tr. 78, or pay the cost of "physical therapy that included massage therapy and water therapy," tr. 75. This explanation, although facially[7] valid, *see Orn v. Astrue*,

---

[6] There is no evidence that these dates conflicted with a medical appointment of record. *See, e.g.*, tr. 494–522.
[7] Susan Middleton, LCSW, plaintiff's treating counselor, indicated in May 2011 that "there is no current reported . . . financial . . . problem[] that I am aware." Tr. 491; *but see* tr. 551 (On January 19, 2012, Dr. Nelson reported that

495 F.3d 625, 638 (9th Cir. 2007), still does *not* explain plaintiff's repeated failure to reduce

opiate intake and engage in her own exercise regime.

Drs. Nelson and Nebolon repeatedly recommended that plaintiff reduce her opiate and

benzodiazepine medication. *See, e.g.*, tr. 357 (5/9/2009); tr. 362 (7/7/2009); tr. 368 (10/15/2009);

tr. 424 (6/1/2010); tr. 472 (11/2/2010); tr. 455 (2/9/2011); tr. 464 (3/8/2011); tr. 505 (6/28/2011).

Between July 2010 and March 2011, Dr. Nelson repeatedly encouraged plaintiff to consider

inpatient treatment for psychiatric management and opiate reduction. *See* tr. 485 (7/15/2010); tr.

479 (10/21/10); tr. 474 (11/2/2010); tr. 464 (3/8/2011). Plaintiff declined inpatient treatment and

decided to pursue progressive reduction. *See, e.g.*, tr. 485 (7/15/2010). Despite this decision,

plaintiff also repeatedly declined to reduce her opiate intake. *See, e.g.*, tr. 472 (11/2/2010); tr.

461 (3/8/2011), tr. 510 (4/22/2011); tr. 498 (8/4/2011); tr. 528 (10/13/11). Plaintiff's reluctance

to reduce opiate medication intake, particularly when plaintiff's treating physicians believed this

intake worsened her pain disorder symptoms, *see, e.g.*, tr. 356 (5/7/2009); tr. 464 (3/8/2011), can

reasonably be considered as an inadequately explained failure to follow a prescribed course of

treatment.

Dr. Nelson also repeatedly recommended that plaintiff work on her own exercise regime.

*See* tr. 495 (8/4/2011); tr. 528 (10/13/11); tr. 551 (1/19/2012). Again, despite this

recommendation, there is no record that plaintiff engaged in such exercise. *See* tr. 551 ("She has

been almost immobile . . . .").

Accordingly, the ALJ properly considered plaintiff's course of treatment record as a clear

and convincing reason for rejecting her testimony.

---

plaintiff "had been previously treating through her psychologist and psychiatrist unfortunately this has become
difficulty for her financially.").

Third, the ALJ concluded that plaintiff's repeated pain exaggeration during examinations supported a finding of poor credibility. Tr. 23. Plaintiff argues that this reported exaggeration is a product of her diagnosed Pain Disorder and should not be considered in rejecting her testimony. *See* Pl.'s Br. 17, ECF No. 15 (citing *Polny v. Bowen*, 864 F.2d 661, 664 (9th Cir. 1988)). This Court looks to the record.

Plaintiff was diagnosed with "307.89 Pain Disorder Associated With Both Psychological Factors and a General Medical Condition" on March 30, 2010, tr. 400–03, January 11, 2011, tr. 457–460, and March 6, 2012, tr. 535–44. "The essential feature of Pain Disorder is pain that is the predominant focus of the clinical presentation and is of sufficient severity to warrant clinical attention." *Diagnostic and Statistical Manual of Mental Disorders* 498 (rev. 4th ed. 2000). The subtype "Pain Disorder Associated with Both Psychological Factors and a General Medical Condition" is "used when both psychological factors and a general medical condition are judged to have important roles in the onset, severity, exacerbation, or maintenance of the pain." *Id.* at 499. Diagnostic criteria for Pain Disorder include:

> 1. Pain in one or more anatomical sites is the predominant focus of the clinical presentation and is of sufficient severity to warrant clinical attention.
>
> 2. The pain causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.
>
> 3. Psychological factors are judged to have an important role in the onset, severity, exacerbation, or maintenance of the pain.
>
> 4. The symptom or deficit is not intentionally produced or feigned (as in Factitious Disorder or Malingering).
>
> 5. The pain is not better accounted for by a Mood, Anxiety, or Psychotic Disorder and does not meet criteria for Dyspareunia.

*Id*. at 503. This Court, having reviewed these diagnostic criteria and the treatment notes reflecting exaggerated pain, *see* tr. 402, 423, 427, 474, 551, finds that plaintiff's exaggerated pain behavior is most appropriately considered part of her diagnosed pain disorder. In particular, this Court relies on Dr. Whitehead's findings in April 2010. *See* tr. 400–03. Following a clinical interview and mental status examination, Dr. Whitehead noted that "[t]here appears to be some exaggeration in pain behavior." Tr. 402. Dr. Whitehead subsequently clarified that he did *not* think that this behavior reflected malingering or intentional falsification of symptoms. Tr. 403. Thus, to the extent that plaintiff exaggerated her pain behavior, such exaggeration does not amount to a clear and convincing reason for rejecting her testimony.

Fourth, the ALJ found that plaintiff's activities of daily living were not consistent with the alleged degree of impairment. Tr. 23. The ALJ explained:

> The claimant's activities tend to show that the claimant does have the ability to perform work. The claimant testified that she drives her children from one house to another (less than five miles) and she reported that she helps fold the laundry. In addition, the claimant uses a computer to show, watches television, and reads. She also reported that she could pay bills, count change, handle a savings account, use a checkbook/money order, and follow instructions very well. Further, treatment notes, from January 2011, indicate that the claimant presented as well groomed, with her makeup, hair, and nails carefully done. The claimant's activities suggest that the claimant has a better physical and mental capacity than she has stated in the testimony.

Tr. 23 (citations and internal quotation marks omitted). An ALJ may rely on daily activities to form the basis of an adverse credibility determination if those activities contradict a plaintiff's testimony or involve the performance of physical functions that are transferable to a work setting. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007). Defendant contends that "the ALJ reasonably considered that [plaintiff's] activities did not support her claims of disabling impairment." Def.'s Br. 10, ECF No. 17. This Court looks to the record.

14 – OPINION AND ORDER

On December 9, 2009, plaintiff reported that she was able to fold laundry for thirty minute periods twice weekly, tr. 209, drove "usually daily," tr. 209, shopped for up to five hours online each month, tr. 210, watched television and read daily, tr. 211, was able to walk for fifteen to twenty minutes, tr. 212, and was bedridden "some days," tr. 209. On January 13, 2012, plaintiff testified that she is unable to "really concentrate" because of her chronic pain and medications, and that she experienced discomfort from standing or sitting for long periods of time. Tr. 72. On April 6, 2012, plaintiff testified that she spends "seventy-five percent of the time" lying in bed, tr. 45, is unable to cook an evening meal, tr. 47, is unable to do the laundry and clean the floors, tr. 47, but is able to drive her children from one house to another usually within less than five miles, tr. 46.

Plaintiff's identified activities, e.g., reading, watching television, and limited driving, are generally so undemanding that they cannot be said to bear a meaningful relationship to the activities of the workplace. *See Orn*, 495 F.3d at 639 ("[R]eading, watching television, and coloring in coloring books . . . cannot be said to bear a meaningful relationship to the activities of the workplace."). In contrast, plaintiff's ability to read up to four hours each day undermines her broad assertion that she is unable to "really concentrate." *Compare* tr. 72, *with* tr. 539. Likewise, plaintiff's reported presentation on January 11, 2011—"She is nicely and stylishly dressed. Her makeup, hair and nails are carefully done," tr. 459—undermines her assertion that she is generally in too "much pain to dry/style" her hair, tr. 208. Thus, the ALJ's reliance on plaintiff's daily activities is only proper insofar as it relates to plaintiff's ability to concentrate and care for herself.[8]

---

[8] This Court also notes that plaintiff's function report dated December 9, 2009, suggests that prior to the onset of her disability, plaintiff engaged in household chores including: laundry, cooking, vacuuming, cleaning, and gardening. *See* tr. 207–14. However, during a neurological screening examination on March 6, 2012, plaintiff indicated that she

The ALJ, having considered the medical record, plaintiff's course of treatment, and plaintiff's activities of daily living, properly discredited plaintiff's statements to the extent that they were inconsistent with the RFC.

### III. Lay Witness Function Report

Plaintiff contends that the ALJ improperly rejected statements submitted by lay witness, Jacob Agatucci. Pl.'s Br. 19–20, ECF No. 15. In response, defendant argues that the ALJ reasonably weighed these statements. Def.'s Br. 14–15, ECF No. 17.

"Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001) (citation omitted); *see also Merrill ex rel. Merrill v. Apfel*, 224 F.3d 1083, 1085 (9th Cir. 2000) ("[A]n ALJ, in determining a claimant's disability, must give full consideration to the testimony of friends and family members." (citation omitted)).

Mr. Agatucci, plaintiff's husband, submitted a function report on February 9, 2009. *See* tr. 199–206. In that report, Mr. Agatucci indicated that plaintiff is bedridden five days a week, needs assistance in personal care (e.g., putting on shoes and socks), goes outside on a daily basis, drives an automobile independently, reads and watches televisions daily, socializes with her family, gets along well with authority figures, and is able to handle changes in routine. Tr. 199–205. Mr. Agatucci also indicated that plaintiff's illness precluded her from lifting more than ten pounds, squatting, bending, walking more than fifteen minutes, kneeling, and climbing stairs without experiencing severe pain. Tr. 204.

---

had not done any vacuuming since marriage (approximately 1996), and reported that "she does no sweeping or dishes and her husband does 99% of the laundry. . . . her husband is 'OCD' and . . . wants to do all the cleaning . . . ." Tr. 539. Such a discrepancy suggests that plaintiff was "less than candid" in her function report. *See Fair v. Bowen*, 885 F.2d 597, 604 n.5 (9th Cir. 1989).

The ALJ, having reviewed this function report, found:

> The claimant did not present Mr. Agatucci as a witness at the hearing.
> Since he is not medically trained to make exacting observations as to
> dates, frequencies, types and degrees of medical signs and symptoms, or
> of the frequency or intensity of unusual moods or mannerisms, the
> accuracy of [his] statements is questionable. A family member can only
> report her observations of the claimant and these observations may not be
> reflective of [her] maximal capacities. Moreover, by virtue of his
> relationship to the claimant, this declarant cannot be considered a
> disinterested third party whose statements would not tend to be colored by
> affection for [her] and a natural tendency to agree with the symptoms and
> limitations [she] alleges. Most importantly, I cannot give great weight to
> [his] statements because they, like the claimant's, are not fully consistent
> with the medical opinions and other evidence discussed herein. To the
> extent that the statements of Mr. Agatucci conflict with the decision in this
> case, I find that they fail to overcome the probative effect of that other
> evidence. Thus, Mr. Agatucci's statements provide no basis for altering
> the [RFC].

Tr. 23. Plaintiff contends that this discussion is inadequate because the ALJ improperly

considered Mr. Agatucci's relationship to plaintiff, Mr. Agatucci's lack of medical training, and

the medical record. *See* Pl.'s Br. 19–20, ECF No. 15. This Court addresses each reason in

sequence.

First, an ALJ may consider the relationship between a claimant and third-party. However,

an ALJ may *not* simply rely on a relationship in the abstract to disregard lay evidence. *See*

*Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009) ("[I]nsofar as the ALJ

relied on characteristics common to all spouses, she ran afoul of our precedents."). In this case,

the ALJ's cursory reference to Mr. Agatucci's relationship to plaintiff does not constitute a

germane reason. *See Vandick v. Colvin*, Civ. No. 3:14-cv-00269-MC, 2015 WL 364341, at *9

(D. Or. Jan. 23, 2015).

Second, an ALJ may not disqualify a lay witness from "rendering an opinion as to how

[his] [wife's] condition affect [her] ability to perform basic work activities" simply because that

17 – OPINION AND ORDER

lay witness is not a vocational or medical expert. *Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2009) (citing 20 C.F.R. § 404.1513(d)(4)). To the extent that the ALJ relied on Mr. Agatucci's lack of vocational or medical training as a reason for rejection, that reason is not germane.

Third, an ALJ *may* reject lay witness testimony if that testimony is inconsistent with the medical record. *See Bayliss*, 427 F.3d at 1218. As indicated *supra* §§ I–II, the medical record, which includes objective medical evidence, treatment notes, and medical opinions, supports the RFC. Thus, "[t]he ALJ's rejection of certain testimony is supported by substantial evidence and was not error." *Bayliss*, 427 F.3d at 1218.

In any event, an error is harmless if "inconsequential to the ultimate nondisability determination." *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006). If, for example, "lay witness testimony does not describe any limitations not already described by the claimant, and the ALJ's well-supported reasons for rejecting the claimant's testimony apply equally well to the lay witness testimony," then this Court may deem the ALJ's failure to articulate germane reasons harmless. *See Molina v. Astrue*, 674 F.3d 1104, 1117 (9th Cir. 2012). Mr. Agatucci's description of plaintiff's limitations is generally similar to plaintiff's own statements. *Compare* tr. 199–206, *with* 207–14. These proffered limitations, to the extent that they were inconsistent with the RFC, were properly rejected in the ALJ's consideration of plaintiff's own credibility. *See supra* § II. Thus, even had an error been committed, such an error was harmless.

## CONCLUSION

For these reasons, the Commissioner's final decision is AFFIRMED.

IT IS SO ORDERED.

       DATED this 30th day of March, 2015.

                         _____
                             **Michael J. McShane**
                       **United States District Judge**

19 – OPINION AND ORDER